**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-03204-NYW-KAS

TOBY LORENC, on behalf of himself and all others similarly situated,

Plaintiff,

v.

ORACLE CORPORATION,

Defendant.

---

# FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiff Toby Lorenc ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for violations of Colo. Rev. Stat. § 6-1-304 (Colorado's "Prevention of Telemarketing Fraud Act" or "PTFA") against Defendant Oracle Corporation ("Defendant" or "Oracle"). Plaintiff makes the following allegations pursuant to his counsel's investigation and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. On May 27, 2005, former Colorado Governor Bill Owens signed into law HB05-1288,[1] which amended the PTFA to prohibit commercially listing a cell phone number in a directory, without permission.[2] *See* Colo. Rev. Stat. § 6-1-304(4)(a)(I).

[1] https://www.leg.state.co.us/clics2005a/csl.nsf/fsbillcont2/1BB0D3E00348AC6987256F90007C20C7?Open. *See also* https://scholar.law.colorado.edu/cgi/viewcontent.cgi?article=3081&context=session-laws-2001-2050.

[2] https://www.leg.state.co.us/CLICS2005A/commsumm.nsf/IndSumm/574E34C489356ADA87256FB100612E60?OpenDocument. *See also* https://www.leg.state.co.us/CLICS2005A/commsumm.nsf/91320994cb8e0b6e8725681d005cb995/574e34c489356ada87256fb100612e60?OpenDocument.

2. This prohibition is designed to protect privacy. As former State Representative Mark Cloer,[3] a prime sponsor of HB05-1288,[4] stated in describing this new portion of the PTFA: "[m]ost people view their cell phones as private. They give out the number to friends and family and some colleagues. When their cell phone rings, they expect it to be important."[5]

3. Indeed, concern over cell phone privacy is widespread. According to a research paper presented in May 2005 at the American Association for Public Opinion Research (AAPOR)'s Annual Conference[6] and January 2006 at the American Statistical Association (ASA)'s Second International Conference on Telephone Survey Methodology:[7]

> [T]here appears to be a strong reluctance on the part of cell phone owners to have their cell phone numbers listed in a directory. …
>
> This reluctance on the part of respondents to have their cell phone number listed in a directory may be rooted in not wishing to incur additional costs due to unsolicited incoming calls. …
>
> A more likely reason for their unwillingness to have their cell phone number listed is that respondents view the cell phone as more of a private medium of communication than their land-line phone. They probably wish to restrict access to their cell phone number to family and friends.[8]

---

[3] *See* https://www.leg.state.co.us/clics2005a/directory.nsf.

[4] https://scholar.law.colorado.edu/cgi/viewcontent.cgi?article=3289&context=session-laws-2001-2050 at p. 2461. *See also* https://www.leg.state.co.us/CLICS2005A/csl.nsf/StatusAll?OpenFrameSet.

[5] https://www.9news.com/article/news/local/politics/legislative-library-feb-23-2005/73-344789916.

[6] https://aapor.org/wp-content/uploads/2024/05/AAPORPrograms2005.pdf at pp. 13, 84.

[7] https://scholar.google.com/citations?view_op=view_citation&hl=en&user=I2jkzr0AAAAJ&citation_for_view=I2jkzr0AAAAJ:M3ejUd6NZC8C; https://ww2.amstat.org/meetings/tsmii/2006/index.cfm?fuseaction=main.

[8] http://www.asasrms.org/Proceedings/y2005/files/JSM2005-000345.pdf at p. 4005.

4. The Colorado General Assembly enacted subsection (4) of the PTFA to address these privacy concerns and to protect cell phone users from the misappropriation of their personal information. This aligns with the PTFA's overall purpose, as articulated by Colo. Rev. Stat. § 6-1-301:

> The general assembly hereby finds, determines, and declares that the use of telephones for commercial solicitation is rapidly increasing; that this form of communication offers unique benefits, but entails special risks and poses the potential for abuse; that the general assembly finds that the widespread practice of fraudulent and deceptive commercial telephone solicitation has caused substantial financial losses to thousands of consumers, and, particularly, elderly, homebound, and otherwise vulnerable consumers, and is a matter vitally affecting the public interest; and, therefore, that the general welfare of the public and the protection of the integrity of the telemarketing industry requires statutory regulation of the commercial use of telephones.

5. Colo. Rev. Stat. § 6-1-304(4) provides, in pertinent part:

> (a) On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly:
>
> > (I) Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing[.]

6. Despite this abundantly clear proscription, Defendant has listed the cellular telephone numbers of thousands of Colorado residents in its for-sale and for-profit directory, without requesting (let alone actually receiving) affirmative consent to such listings.

7. Thus, while Defendant profits handsomely from its unauthorized commercial listing of Plaintiff's and other Class Members' personal information, it does so at the expense of Coloradans' statutory privacy rights under the PTFA.

8. Not only is Defendant's misappropriation unlawful – it is also dangerous. The Federal Trade Commission's ("FTC") report on "Data Brokers" states:

> There are a number of potential risks to consumers from data brokers' collection and use of consumer data. … [T]hey may facilitate the sending of advertisements … which some consumers may find troubling and which could undermine their trust in the marketplace. Moreover, … people search products can be used to facilitate harassment, or even stalking, and may expose domestic violence victims, law enforcement officers, prosecutors, public officials, or other individuals to retaliation or other harm. [In addition, s]toring [d]ata [a]bout [c]onsumers [i]ndefinitely [m]ay [c]reate [s]ecurity [r]isks[.][9]

9. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of Colorado cell phone users and to recover statutory damages from Defendant, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

## PARTIES

10. Plaintiff Toby Lorenc is, and has been at all relevant times, a resident and citizen of Colorado Springs, Colorado. Plaintiff's cellular telephone number was listed by Defendant in its Oracle Contact Enrichment directory, pursuant to Defendant's provision of its paid services. Defendant never requested – and Plaintiff never provided – affirmative consent, through written, oral, or electronic means, to such listings.

---

[9] https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf at p. 48.

Plaintiff had no reasonable ability to discover Defendant's use of his personal information until shortly before filing suit.

11. Defendant Oracle Corporation is a Delaware corporation with its principal place of business at 2300 Oracle Way, Austin, Texas 78741. Defendant is primarily engaged in the business of selling or leasing goods or services. Specifically, Defendant operates the paid Oracle Contact Enrichment directory. Therein, and for commercial purposes, Defendant has listed the cellular telephone numbers of thousands of individuals whom it knows to reside in Colorado.

## JURISDICTION AND VENUE

12. Defendant removed this action to this Court from the District Court of Denver County, Colorado, where Plaintiff originally filed it as Case No. 2026CV32244. Defendant thus bears the burden of establishing subject matter jurisdiction. Defendant asserts that "this Court has jurisdiction pursuant to CAFA and 28 U.S.C. §§ 1332(d), 1441, and 1453, because (1) this case is a putative class action with more than 100 members in the proposed class; (2) there is minimal diversity, since at least one member of the proposed class, on the one hand, and Oracle, on the other, are citizens of different states; and (3) the Complaint places in controversy an amount that exceeds $5 million in the aggregate, considering all damages and equitable relief sought on behalf of Plaintiff and the proposed class, exclusive of interest and costs." ECF No. 1 ¶ 5.

13. The Court has personal jurisdiction over Defendant because Defendant transacts business in Colorado. The Court also has personal jurisdiction over Defendant because its tortious conduct – listing the cellular telephone numbers of thousands of individuals whom Defendant knows to reside in Colorado, without requesting or receiving said individuals' affirmative consent – caused injury in Colorado and thus constituted a tort here.

14. Venue is proper in this District because this action was removed from the District Court of Denver County, Colorado, which lies within this District. See 28 U.S.C. § 1441(a). Venue is additionally proper in this District under 28 U.S.C. § 1391(b) because Defendant conducts significant amounts of business transactions within this District and because the wrongful conduct giving rise to this case occurred in and was directed to this District. Venue is additionally proper because Plaintiff resides in Colorado Springs, Colorado, which is in this District.

//

//

//

//

//

//

//

//

## FACTUAL BACKGROUND

### A. Overview of Defendant's Directory

15. Defendant provides an online business-to-business or "B2B Lead Generation Directory Service[, a] platform[] … that facilitate[s] identifying and acquiring potential business-to-business leads. This kind of service compiles and organizes … contact details, business categories, industry, size, location, and other relevant data. B2B Lead Generation Directories … often offer a range of features tailored to B2B marketing and sales needs."[10]

16. Specifically, "Oracle partners with Dun & Bradstreet"[11] to provide "Data as a Service (DaaS), with access to over 125 firmographic attributes for more than 347 million company records and 135 million contact records worldwide."[12] Defendant states that "Data as a Service (DaaS) … provides marketers with easy access to actionable data to help them drive more effective B2B campaigns using the industry's market-leading data."[13]

17. Defendant and its competitors monetize people's personal details through their respective directories – some of which are ad-supported and give users free access to the data, and others of which furnish reports about people for a fee.

18. Users of Defendant's Oracle Contact Enrichment directory can view Coloradans' cell phone numbers, job titles, and more.

---

[10] https://targetron.com/lead-generation-directory/.

[11] https://www.oracle.com/a/ocom/docs/daas-for-marketing.pdf.

[12] https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/about-data-as-a-service.html.

[13] https://www.oracle.com/a/ocom/docs/daas-for-marketing.pdf; *see also* https://www.oracle.com/a/ocom/docs/daas-for-sales.pdf ("The use of third-party data to qualify and prospect new business can significantly increase sales efficiency and revenue. … Oracle Data as a Service (DaaS) for Sales enables smarter selling by helping discover and reach prospects with the highest quality and most comprehensive third-party data including millions of companies, and contacts.").

19. This is achieved by simply searching for an individual by name, company, job title, location, and/or other parameters.




20. Next, an Oracle Contact Enrichment user is furnished with a list of search results featuring individuals matching the selected parameters. From this search results list, a user may click to access a particular individual's contact profile or export numerous individuals' contact information.



21. Upon clicking to access a particular individual's contact profile, an Oracle Contact Enrichment user is presented with the individual's phone number(s) and other identifying information. Upon clicking to export numerous individuals' contact information, an Oracle Contact Enrichment user is presented with each individual's phone number(s) and other identifying information.




**Individual's contact profile**




| Email Address | First Name | Last Name | Title | Company | Business Phone | Address 1 | City |
|---|---|---|---|---|---|---|---|
| RAMOSMA@DNB.COM | Maureen | Ramos | Global Alliances and Partn | The Dun & Bradstreet Cor | 2392077191 | 103 JFK Pkwy | Short Hills |
| KRISTI.DETWEILER@AVE | Kristi | Detweiler | Senior Product Manager | Avention, Inc. | | 300 Baker Ave Ste 370 | Concord |
| SHEPARDJ@DNB.COM | Jenny | Shepard | Global Alliances and Partn | Dun & Bradstreet, Inc | 7149386337 | 103 JFK Pkwy | Short Hills |
| ALICE.BARTRAM@AVENTI | Alice | Bartram | Vice President Marketing | Avention, Inc. | | 300 Baker Ave Ste 370 | Concord |

**Numerous individuals' contact information**

//

//

//

22. As an alternative, an Oracle Contact Enrichment user may view information about a particular company. A user can view a company's profile, which includes the company's name, industry, employee count, and/or other details.




23. Next, an Oracle Contact Enrichment user can click to search for "contacts" affiliated with the company.



24. An Oracle Contact Enrichment user can filter a company's "contacts" by job title level, location (city and state), job function, and/or organization level.












25. After filtering a company's "contacts," an Oracle Contact Enrichment user is furnished with a list of individuals matching the selected parameters. There, an Oracle Contact Enrichment user is presented with the individuals' names, job titles, phone numbers, and/or email addresses.




26. An Oracle Contact Enrichment user can select a particular individual from the list of a company's "contacts." The user is then presented with a profile that includes the selected individual's phone number and other identifying information.



27. As an additional alternative, an Oracle Contact Enrichment user may create a "contact" by supplying as little information as an individual's name and company. The user may then click to "enrich" the contact.




28. Next, an Oracle Contact Enrichment user may select the particular contact information fields to enrich, including job title, phone number, department, email address, and/or other parameters.



29. An Oracle Contact Enrichment user is then presented with the requested identifying information, including the “contact’s” job title, phone number, department, email address, and/or other details.




30. Defendant knowingly lists Coloradans’ cell phone numbers in its directory. Indeed, Defendant states: “The following attributes are searched for contact searches: First Name[,] Middle Name[,] Last Name[,]…Contact Direct Phone Number[, and] Contact Work Phone[.]”[14] Defendant further advertises: “The following contact attributes are provided with Oracle Contact Enrichment subscriptions[:] … Company Phone[,] … Company Phone Extension[,] … Direct Dial Phone[.]”[15]

[14] https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/search-for-a-company-or-contact.html. *See also* https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/explore-the-record-details.html (“From search results, click a company or contact name to open an overview page with summary information. For contacts, you see a contact profile, including the company profile with which the contact is associated. … Some details (such as D-U-N-S Number, Global Ultimate D-U-N-S Number, Parent D-U-N-S Number, Headquarter D-U-N-S Number, Trade Style 3, Trade Style 4, Trade Style 5, Company Phone, Extension, Primary Phone, and Email) are shown only when the record has been purchased.”).

[15] https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/understand-attributes.html.

31. Defendant lists Plaintiff's and Class Members' cell phone numbers for a commercial purpose: to fulfill Defendant's obligations to individuals who have paid for Oracle's contact enrichment and account enrichment products. Indeed, that is Defendant's entire purpose for this service. Defendant is literally selling Plaintiff's and Class Members' cell phone numbers and accompanying information to its customers, who in turn use that very data for sales and marketing purposes.[16]

**B. Defendant's Conduct Harms Coloradans**

32. Consumer data is key to the $26 billion-per-year online advertising industry in the United States.[17] Clearly, and per the FTC, consumer data possesses inherent monetary value:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[18]

33. In fact, individuals' private information has become such a valuable commodity that companies now offer individuals the opportunity to monetize their personal data.[19]

---

[16] Defendant offers a subscription called the "Oracle Contact Enrichment Cloud Service." *See* https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/understand-daas-subscriptions.html. With this subscription, the "minimum number of records that can be purchased is 2,000 records in total." https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/faq--subscriptions.html.

[17] http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.

[18] https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf at p. 2.

[19] *See, e.g.*, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/; http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html; https://techcrunch.com/2023/08/16/caden-lands-15m-to-let-users-monetize-their-personal-data/; https://www.theverge.com/2019/6/11/18661595/facebook-study-app-monitor-phone-usage-pay; https://sifted.eu/articles/gener8; https://www.theverge.com/2012/2/8/2785751/google-screenwise-panel-web-monitoring-knowledge-networks; https://www.sidehustlenation.com/get-paid-for-your-data/; https://millennialmoneyman.com/get-paid-for-your-data/.

34. These companies' business models capitalize on a fundamental principle underlying the modern information marketplace: Consumers recognize the economic value of their private data. Along these lines, research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[20] A 2014 survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers avoid doing business with companies who they believe do not protect their privacy.[21] The same is true for 80 percent of smartphone users, who say that they avoid using smartphone apps that they don't believe protect their privacy.[22]

35. Defendant's misappropriation of Coloradans' cell phone numbers undeniably deprives state residents of the ability to enjoy their PTFA privacy rights. It also deprives them of the real, quantifiable value of such data.

36. Further, sites like Defendant's "offer a wealth of information that can be exploited by malicious actors."[23] For one, "[b]undling [personal data] all together and making it so easily accessible can … put ordinary people at risk of … stalking and other forms of harassment."[24] Second, people search sites' "comprehensive data allows cybercriminals to build detailed profiles of potential victims, making it easier to craft

---

[20] *See, e.g.*, https://web.archive.org/web/20250622135647/https://www.enisa.europa.eu/sites/default/files/publications/monetising_privacy.pdf; https://papers.ssrn.com/sol3/Delivery.cfm?abstractid=3305347.

[21] *See* https://web.archive.org/web/20190820142832/http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf at p. 3.

[22] *Id.*

[23] https://www.foxnews.com/tech/dangerous-intersection-people-search-sites-scams.

[24] https://innovation.consumerreports.org/Data-Defense_-Evaluating-People-Search-Site-Removal-Services-.pdf.

convincing scams or carry out identity theft."[25] This "put[s] almost anyone within the reach of fraudulent telemarketers[]" and other wrongdoers.[26]

37. Information disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[27] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[28]

38. Making matters worse, "[o]nce marked as receptive to [a specific] type of scam, a consumer often is bombarded with similar fraudulent offers from a host of scam artists."[29]

39. Finally, Defendant is listing individuals' cellular telephone numbers so that Defendant's customers can directly harass those individuals with sales and marketing calls. Those calls are unwanted and highly annoying, and the PTFA was enacted to curtail them.

40. Cell phone numbers are also a key piece of information for SIM swappers - hackers who take over a target's phone number in order to receive their calls and

---

[25] https://www.foxnews.com/tech/dangerous-intersection-people-search-sites-scams.

[26] http://www.nytimes.com/2007/05/20/business/20tele.html.

[27] *Id.*

[28] https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf at p. 1.

[29] *Id.* at p. 3.

texts, which in turn can let them break into all manner of accounts. These sorts of hackers have been linked to countless hacks of individual people in order to, among other things, steal online usernames or cryptocurrency. Some have worked directly with ransomware gangs from Eastern Europe. Armed with a cell phone number, a SIM swapper may then impersonate the victim and convince their telecom provider to reroute text messages to a SIM card the hacker controls. From there, the hacker can request password reset text messages, or multifactor authentication codes, and log in to the victim's valuable accounts. This could include accounts at financial institutions, accounts that store cryptocurrency or, even more damaging, their email accounts, which in turn could grant access to many other accounts. For this reason, the FBI recommends on its website that people do not publicly advertise their phone number. "Protect your personal and financial information. Don't advertise your phone number, address, or financial assets, including ownership or investment of cryptocurrency, on social media sites," the site reads.[30]

## CLASS ALLEGATIONS

41. Plaintiff seeks to represent a class defined as all Colorado residents whose cell phone numbers were listed by Oracle without their affirmative consent during the applicable statute of limitations period (the "Class").

[30] https://www.wired.com/story/a-researcher-figured-out-how-to-reveal-any-phone-number-linked-to-a-google-account/; https://www.fbi.gov/contact-us/field-offices/phoenix/news/press-releases/fbi-tech-tuesday-sim-swapping.

42. Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

43. **Numerosity:** The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

44. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class. The questions of law and fact common to the proposed Class predominate over questions affecting only individual Class Members. Such questions include, but are not limited to, the following: whether Defendant violated Colo. Rev. Stat. § 6-1-304(4)(a)(I); and whether Plaintiff and Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

45. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because Plaintiff, like all other Class Members, had his cell phone number listed by Defendant for a commercial purpose; Defendant did so without requesting or receiving Plaintiff's affirmative consent (through written, oral, or electronic means); and Defendant's misappropriation of Plaintiff's personal data (including the economic value thereof) came at the expense of Plaintiff's PTFA privacy rights.

46. **Adequacy:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class she seeks to represent, he

has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

47. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

//

//

//

//

## CAUSES OF ACTION

### COUNT I
### Violation of the Prevention of Telemarketing Fraud Act, Colo. Rev. Stat. § 6-1-304(4)(a)(I)

48. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

49. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

50. Colo. Rev. Stat. § 6-1-304(4) provides, in pertinent part:

> (a) On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly:
>
> > (I) Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing[.]

51. Defendant failed to comply with this PTFA mandate.

52. Defendant knowingly lists Coloradans' cell phone numbers in its directory. Indeed, Defendant states: "The following attributes are searched for contact searches: First Name[,] Middle Name[,] Last Name[,]…Contact Direct Phone Number[, and] Contact Work Phone[.]"[31] Defendant further advertises: "The following contact attributes are provided with Oracle Contact Enrichment subscriptions[:] … Company Phone[,] … Company Phone Extension[,] … Direct Dial Phone[.]"[32]

---

[31] https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/search-for-a-company-or-contact.html. *See also* https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/explore-the-record-details.html ("From search results, click a company or contact name to open an overview page with summary information. For contacts, you see a contact profile, including the company profile with which the contact is associated. … Some details (such as D-U-N-S Number, Global Ultimate D-U-N-S Number, Parent D-U-N-S Number, Headquarter D-U-N-S Number, Trade Style 3, Trade Style 4, Trade Style 5, Company Phone, Extension, Primary Phone, and Email) are shown only when the record has been purchased.").

[32] https://docs.oracle.com/en/cloud/saas/social-data-insight-cloud/csdsr/understand-attributes.html.

53. To "list" in this context means "to have or show (someone or something) as part of a list, register, or record." *See List,* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/list.

54. The Oracle Contact Enrichment service is a directory – i.e., an "electronic resource containing lists of information, usually in alphabetical order, for example people's phone numbers or the names and addresses of businesses in a particular area." *Directory*, Oxford Learner's Dictionary, https://oxfordlearnersdictionaries.com/us/definition/english/directory. [33]

55. Defendant lists Plaintiff's and Class Members' cell phone numbers for a commercial purpose: to fulfill Defendant's obligations to individuals who have paid for Oracle's contact enrichment and account enrichment products. Indeed, that is Defendant's entire purpose for this service. Defendant is literally selling Plaintiff's and Class Members' cell phone numbers and accompanying information to its customers, who in turn use that very data for sales and marketing purposes.

56. Defendant never requests nor receives Coloradans' "affirmative consent, through written, oral, or electronic means, to such listing[.]" Colo. Rev. Stat. § 6-1-304(4)(a)(I). In fact, Defendant never requests nor receives any consent whatsoever, affirmative or otherwise, to list cell phone numbers. Rather, Defendant lists the cell

[33] *See also Directory*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/directory ("an alphabetical or classified list (as of names and addresses)[.]"); *Directory*, Cambridge Essential American English Dictionary, https://dictionary.cambridge.org/us/dictionary/essential-american-english/directory ("a book or list of names and numbers"); *Directory*, AllWords.com Multi-Lingual Dictionary, https://www.allwords.com/word-directory.html ("A list of names, address etc., of specific classes of people or organizations, often in alphabetical order or in some classification.").

phone numbers of Coloradans it has never engaged with, has had no connection to, and who are unaware of Defendant's existence.

57. Defendant's misappropriation of Class Members' personal data (including the economic value thereof) came at the expense of Class Members' PTFA privacy rights. It deprived Class Members of the real, quantifiable value of such data. And it exposed Class Members to elevated risks of stalking, harassment, scams, identity theft, and unwanted telemarketing.

58. Thus, on behalf of himself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class; (3) damages, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars and not more than five hundred dollars for each first offense, and at least five hundred dollars and not more than one thousand dollars for each second or subsequent offense; and (4) reasonable attorneys' fees and other litigation costs pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the proposed Class, respectfully requests that this Court enter an Order:

(a) Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as Class Counsel;

(b) Declaring that Defendant's actions, as set out above, violate Colo. Rev. Stat. § 6-1-304(4)(a)(I) (Colorado's "Prevention of Telemarketing Fraud Act" or "PTFA");

(c) Awarding damages, pursuant to Colo. Rev. Stat. § 6-1-

305(1)(c), of at least three hundred dollars and not more than five hundred dollars for each first offense, and at least five hundred dollars and not more than one thousand dollars for each second or subsequent offense;

(d) Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an Order requiring Defendant to comply with the PTFA;

(e) Awarding Plaintiff and the Class their reasonable attorneys' fees and other litigation costs pursuant to Colo. Rev. Stat. § 6-1-305(1)(c);

(f) Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

(g) Awarding such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 15, 2026

Respectfully Submitted,

**BURSOR & FISHER, P.A.**

*/s/ Matthew A. Girardi*
Matthew A. Girardi
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
Email: mgirardi@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com

**PELUSO LAW LLC**
Patrick H. Peluso (#47642)
865 Albion Street, Suite 250
Denver, CO 80220
Telephone: (720) 805-2008
Facsimile: (720) 336-3663
Email: ppeluso@pelusolawfirm.com

*Attorneys for Plaintiff*